T.C. Memo. 1997-241


UNITED STATES TAX COURT


ESTATE OF JUANITA F. SIRMANS, DECEASED,
DAN L. SIRMANS, EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8466-94.                    Filed May 28, 1997.


<u>David M. Green</u> and <u>Thomas Gallo</u>, for petitioner.

<u>Lawrence B. Austin</u> and <u>Lawrence Green</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined an estate tax deficiency of $123,087.43 with respect to the Estate of Juanita F. Sirmans, Deceased.  After concessions, the sole issue for decision is the date-of-death value of certain

real property owned by the decedent on the date of her death.

FINDINGS OF FACT

The decedent, Juanita F. Sirmans, died testate on September 7, 1990.  She was a resident of DeKalb County, Georgia, at the time.  She was survived by her son, Mr. Dan L. Sirmans, who was appointed executor of her estate.  Mr. Sirmans resided in Manilus, New York, at the time the instant petition was filed.

At the time of trial, Mr. Sirmans held a master of science degree from Rochester Institute of Technology, and he was in the process of completing his Ph.D. at Syracuse University.  Mr. Sirmans was employed by Rochester Institute of Technology as an adjunct professor and by Carrier Corp. as a senior consulting manager.

In 1984, while the decedent was living in Atlanta, Georgia, she suffered a severe stroke.  After the stroke, she moved to her son's home, which was in St. Louis, Missouri, at that time.  Mr. Sirmans soon realized that the decedent was no longer capable of handling her own financial affairs.  Accordingly, at Mr. Sirmans' suggestion, the decedent executed a power of attorney authorizing him to act on her behalf.  Mr. Sirmans handled

the decedent's affairs pursuant to the power of attorney from 1984 until the date of the decedent's death.

After receiving the decedent's power of attorney, Mr. Sirmans proceeded to inventory and value all of the decedent's property.  Among other assets, the decedent owned 56.5 acres of land in Hillsborough County, Florida.  The property is located on Hixon Road, approximately 1 mile south of Citrus Park, a community northwest of Tampa, Florida.  The decedent had inherited the property from her father in 1975.  It had been used as an orange grove until the orange grove was destroyed by a freeze.

The area in which the property is located, as well as the Tampa area in general, had experienced substantial growth in the decade preceding the decedent's death. The direction of the growth from downtown Tampa had been toward the subject property.  As of the date of the decedent's death, the development and construction of residences and apartment complexes had slowed dramatically.

The subject property is identified on the Hillsborough County tax roles as two contiguous parcels of property referred to as "folios" 3143 and 3143.5.  Folio 3143 consists of approximately 30.03 acres, and folio 3143.5 consists of approximately 26.47 acres.  Much of both parcels is wetland or environmentally sensitive property

that cannot be developed.  While no Government agency had formally designated any part of the subject property as wetland, we find that, as of the time of the decedent's death, the breakdown between wetland and dry land for each parcel was as follows:

| Folio | Total | Wetland | Dry Land |
|-------|-------|---------|----------|
| 3143.0 | 30.03 | 10.03 (33.40%) | 20.00 (66.60%) |
| 3143.5 | 26.47 | 23.00 (86.89%) | 3.47 (13.11%) |
| | 56.50 | 33.03 (58.46%) | 23.47 (41.54%) |

We sometimes refer to the portion of the subject property consisting of so-called dry land as "usable acres".

On December 7, 1984, Mr. Sirmans hired Mr. John Hunt, ARA, to appraise the decedent's 56.5 acre parcel.  Mr. Hunt concluded that the highest and best use of the decedent's property was for residential use.  Using the market value approach, under which similar parcels of property are compared to the subject parcel, Mr. Hunt valued the subject property as follows:

```
22.27 acres highland @ $10,000/Ac = $222,700
34.23 acres low swamp @ 500/Ac    =   17,115
56.50                                 239,815

Value from the market approach        240,000
```

In 1987, the decedent suffered a second stroke and her health worsened. Because the decedent required continuous care, Mr. Sirmans placed her in a nursing home. From 1987, until her death, the decedent lived in and out of various nursing homes. During this period, the decedent's medical bills approximated $50,000 to $60,000 per year.

As a result of the decedent's living expenses and escalating medical bills, Mr. Sirmans became concerned about the decedent's financial security and the liquidity of her assets. Accordingly, he considered selling the decedent's 56.5 acres of land. Beginning in 1987 and continuing through 1989, from time to time he permitted different brokers to show the property. He did not enter into a listing agreement with any of the brokers, but he told them that the asking price for the property was $625,000, that is, $25,000 per acre for the usable property of approximately 25 acres. Mr. Sirmans considered the portion of the subject property that was wetland to have little or no value.

For property tax year 1988, the tax assessor for Hillsborough County valued the subject property at $472,640. The assessed value of the parcel designated folio 3143 was $362,400, or 76.68 percent of the total, and

the assessed value of the parcel designated folio 3143.5 was $110,240, or 23.32 percent of the total.

In late 1989, Mr. Sirmans signed an exclusive listing agreement with Mr. Joe Wegman of Wegman Associates, Inc., Realtors (Wegman Realty), a company that had been in existence for over 30 years. Wegman Realty placed signs on the property and engaged in direct mail advertising in an attempt to sell the property. For the so-called dry land, Wegman Realty set the purchase price at $25,000 per acre. Despite Wegman Realty's marketing efforts that included showing the land to approximately 200 persons, no offer to purchase the property was received.

In January 1990, shortly after signing the exclusive listing agreement with Wegman Realty, Mr. Sirmans learned that Hillsborough County was planning to acquire a portion of the decedent's land for a road project. Mr. Sirmans hired an attorney, Mr. George Phillips, to represent him before the County and at public hearings. In February 1990, Mr. Phillips sent Mr. Sirmans a letter which stated that there was virtually no chance of selling the property during the time it would take for the County to consider the road project. One of the "chief difficulties" that Mr. Wegman had in marketing the property was the fact that the road right-of-way was not definite and, as Mr. Wegman

testified, "nobody knew exactly where the road was going to go". Mr. Sirmans' attorney, Mr. Phillips, suggested taking the property off the market and investigating the possibility of borrowing against the property.

After several inquiries of mortgage brokers and financial institutions, Mr. Sirmans learned that banks would consider lending approximately 30 to 50 percent of the value of the property. As a prerequisite, the banks would require a recent appraisal of the property and would require Mr. Sirmans to guarantee the loan personally.

After these initial inquiries, Mr. Sirmans contacted several appraisers. He asked for an appraisal of the subject property that would be "a very attractive or high appraisal, so that it would be an appealing loan for a bank to consider". At least one appraiser refused to provide an appraisal on that basis.

Mr. Sirmans discussed the appraisal with a representative of Bay Area Appraisal Services (BAAS) and that firm agreed to appraise the decedent's 56.5 acres. Thereafter, BAAS issued a letter dated June 18, 1990, and an appraisal report of the decedent's property (BAAS appraisal) in which it valued the decedent's property at $791,000 as of the date of the letter, 81 days before the decedent's death. The BAAS appraisal concluded that the

highest and best use of the property was for development as a residential subdivision. The BAAS appraisal is based upon the assumption that, under the zoning code of Hillsborough County, the property would be limited to residential usage at a density of not more than six dwelling units per acre.

Mr. Sirmans gave the BAAS appraisal or portions of the appraisal to several banks in connection with loan applications. However, he never obtained a loan using the decedent's land as security.

In a letter dated February 14, 1991, 5 months after the decedent's death, Mr. Sirmans was formally notified of Hillsborough County's plan to acquire 4.83 acres of the decedent's property for a roadway project. The letter was addressed to the decedent and was written by an appraiser retained by the County, Mr. Edward L. Fishback, MAI. Mr. Fishback's letter states as follows:

> Dear Ms. Sirmans:
>
> The Hillsborough County Real Estate Department has engaged the undersigned to make an appraisal of the property shown on the attached plot plan for the purpose of acquiring a portion of the right-of-way for the above referenced project.
>
> This is to advise you that we have scheduled a field inspection of your property on the date and at the time listed below. Please consider this an invitation for you or your designated

representative to exercise your legal right to accompany us on this inspection. If a survey or site plan of said property is available, please bring it with you on the date of inspection so as to expedite the appraisal process.

Date: February 19, 1991 (Tuesday)
Time: 9:AM

If you have any questions, please contact Patrick Fishback of our office (Phone 813-251-5139) at any time.

Sincerely,

Edward L. Fishback, MAI

On April 19, 1991, Mr. Fishback submitted his appraisal of the 4.83 acres of the parcel designated folio 3143 to Mr. Richard Sargent, Director-Real Estate Department, Hillsborough County (Fishback appraisal). According to the appraisal, as of April 19, 1991, the value of the parcel designated folio 3143 using a comparable sale approach was $390,500. The appraisal estimated that the market value of the 4.83 acres to be acquired for the proposed road right-of-way, including damages to the remaining property, was $94,320.

By letter dated May 8, 1991, Mr. Michael Caruthers of the Board of County Commissioners, Office of the County Administrator, wrote to the decedent, c/o Mr. Sirmans, and offered to purchase the 4.83 acres of the decedent's

property for $94,505.  Mr. Caruthers' letter states as

follows:

Dear Ms. Sirmans:

Hillsborough County is in the process of
acquiring right of way for a road project on
Paglen Road.  Our right of way maps indicate
that we need to acquire 4.83 acres of your
property.  The County has obtained the services
of a professional appraiser to appraise your
property.  Hillsborough County is offering the
market value of the property needed for right
of way.

Our offer for right of way Parcel 123 is
$94,505.00.

As an aid to help you identify the subject
property, I have enclosed a sketch and legal
description of Parcel 123.

When the County acquires property, we must show
clear title.  Please notify us if there are any
encumbrances against the property.

When the County purchases the needed right of
way, we pay all normal closing costs except
property taxes.  You will be required to pay
your pro-rata share of taxes at the closing.

By law, all offers are subject to the approval
of the Board of County Commissioners of
Hillsborough County, Florida.

If you need any further information regarding
this matter, please feel free to contact me.

Very truly yours,

Richard Sargent, Director,
Real Estate Department

In a letter dated May 20, 1991, Mr. Sirmans rejected the County's offer and made a counterproposal to sell the 4.83 acres of the property for $20,000 per acre or $96,600. Mr. Sirmans' letter states as follows:

RE: Project 89-77-R, Paglen Road, Parcel 123

Attention: Mr. Michael W. Caruthers

Dear Mr. Caruthers:

I am in receipt of your letter dated May 8, 1991, regarding the above referenced project. In regards to the property involved, there are several facts of which you need to be advised. These are as follows:

* * * * * * *

2. The appraisal and your offer place a value on the property of $19,500.00 per acre. I find this to be inconsistent with the valuation of the property for tax purposes. The market value for tax purposes for the last several years has been $20,000.00 per acre. I believe it to be only fair that your offer price be consistent with what the county has been using as a basis for taxes. I would, therefore be willing to accept an offer of $20,000.00 per acre or $96,600.00 for the 4.83 acres as compared to your offer of $19,500.00 per acre or $94,185.00 for the 4.83 acres.

3. Prior to receiving your offer, I had entered into an agreement with Mr. Ronald Carnes of Odessa, Florida to raise cattle on the property. This required removing the existing fence and replacing it with a five strand barbed wire fence at a considerable

cost.  Construction of the roadway will now require the installation of an approximately additional 3,442.08 feet of five strand fencing.  The "cost to cure" amount in your offer is, therefore, incorrect.  I am in the process of obtaining an estimate for the cost of the additional fencing and will advise you as soon as I receive it.

4.  I understand that I am entitled to obtain an appraisal of my own and that the county is required to reimburse me for the cost of that appraisal.  I have been advised that such an appraisal can run as much as $4,000.00-$5,000.00.  If you will adjust your offer to $20,000.00 per acre and make a reasonable adjustment to the "cost to cure" to allow for the additional fencing, then I will forego the additional appraisal.

I trust that this provides you with as much information as is currently possible.  I will provide you with further information as soon as I am able to obtain it.  If you have any questions in the meantime, please let me know.

                    Very truly yours,

                    /s Dan L. Sirmans

                    Dan L. Sirmans

CC: Mr. John W. Lawson, Esq.


In response, Mr. Caruthers wrote the following letter dated

May 28, 1991:


I have reviewed your proposal for the above referenced parcel, and it appears to be an equitable settlement.  We will be looking into the cost of fencing and get back to you

with a revised offer.  I believe we are in basic
agreement on the settlement, but we will request
our appraiser to review the proposal.  I wish to
thank you for the information provided.  Please
keep me up to date on the title transfer.  If
you need any further information, feel free to
contact me.

Several months later, Mr. Caruthers sent another
letter dated October 3, 1991, to Mr. Sirmans:

I have enclosed for your handling a Purchase
Agreement in the amount of $100,795.27 for the
acquisition of the above referenced Parcel 123.

Thus, the purchase price for decedent's 4.83 acres,
$100,795.27, was based upon an agreed price paid for the
land of $20,000 per acre.  The purchase price was reduced
by a property tax arrearage in the amount of $29,611.42,
and airborne and wiring charges totaling $40.  Accordingly,
the estate ultimately received cash in the amount of
$71,143.85 for the 4.83 acres.

Mr. Sirmans filed Form 706, United States Estate (and
Generation Skipping Transfer) Tax Return, as executor of
the decedent's estate.  He did not elect alternative
valuation.  Thus, he reported the value of the decedent's
assets as of the date of death.  On Schedule A--Real
Estate, attached to the estate tax return, Mr. Sirmans
reported $509,529 as the value of the subject 56.5 acres.
In computing that amount, Mr. Sirmans concluded that the

value of the parcel designated folio 3143 was $390,500.
This is the value of that parcel as set forth in
Mr. Fishback's appraisal for Hillsborough County.
Mr. Sirmans concluded that the value of the entire property
was $509,259 based upon the fact that the parcel designated
folio 3143 was 76.68 percent of the assessed value of the
entire tract for property tax purposes (i.e., $390,500 ÷
76.68 percent).  He concluded that the value of the parcel
designated folio 3143.5 was $118,759.  This amount is the
difference between the value of the entire tract, $509,259,
and the value of the parcel designated folio 3143,
$390,500.  Mr. Sirmans' calculation can be illustrated as
follows:

| Folio | Assessed Value | Appraised Value | Estate Value |
|-------|----------------|-----------------|--------------|
| 3143 | $362,400 (76.68%) | $390,500 | $390,500 |
| 3143.5 | 110,240 (23.32%) | -- | 118,759 |
| | | | 509,259 |

According to Mr. Sirmans, the value at which he returned
the subject property for estate tax purposes works out to
approximately $200 per acre for the wetland acreage and
approximately $20,000 per acre for the so-called dry land.
In passing, we note that the value of the property reported
on the subject estate tax return, $509,529, differs

slightly from the amount discussed in petitioner's post-trial briefs, $509,259.

In the subject notice of deficiency, among other adjustments, respondent determined that the value of the subject property on the date of the decedent's death was $791,000. The notice includes the following explanation of the adjustment:

> The fair market value, at the date of decedent's death, of the 56.5 acres located in the northwest 1/4 of the south 1/22 of section 2, Township 28 South, Range 19 East, Tampa, Hillsborough County, Florida, was $791,000.00 instead of $509,529.00 as reported on the estate tax return. Accordingly, the reported value of the taxable estate is increased $281,471.00.

## OPINION

The sole issue for decision in this case is whether the 56.5 acres owned by the decedent on the date of her death was worth $791,000, as determined by respondent, or $509,529, as reported on the estate tax return filed on behalf of the decedent's estate. Petitioner bears the burden of proving the fair market value of the 56.5 acres owned by the decedent on the date of her death. Rule 142(a). All Rule references are to the Tax Court Rules of Practice and Procedure.

The value of the subject property as determined by respondent in the notice of deficiency, $791,000, is based

on the BAAS appraisal dated April 18, 1990. That appraisal was requested by the decedent's son, Mr. Dan Sirmans, and, respondent argues, it is the only appraisal which considers all 56.5 acres of the decedent's land and is the best evidence of the land's value on September 7, 1990, the date of the decedent's death, 81 days later.

The value of the subject property reported for estate tax purposes, $509,529, is based on the Fishback appraisal of the parcel designated folio 3143 that was made at the request of Hillsborough County in connection with its purchase of 4.83 acres of that parcel for a road right-of-way. Petitioner contends that the reported value of the subject property is shown to be the correct value by "the great weight of the valuation evidence" in this case, consisting of the Hunt appraisal in 1984, the Hillsborough County real estate tax assessments for the years 1988, 1989, and 1990, the comparable sales listed in the BAAS appraisal in 1990, the Fishback appraisal in 1991, the sale of 4.83 acres of folio 3143 to Hillsborough County, the opinion of Mr. Joseph Wegman of Wegman Realty, and Mr. Sirmans' own experiences in trying to sell the subject property for the decedent. Petitioner also contends that the BAAS appraisal, on which respondent's determination is

based, is not reliable because it fails to differentiate between so-called dry land and wetland.

Section 2031(a) requires the "gross estate" of the decedent to be determined for Federal estate tax purposes, "by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." All section references are to the Internal Revenue Code as in effect for 1990. The fair market value of property included in a decedent's gross estate is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs. This requires property to be valued from the viewpoint of a hypothetical buyer and seller, each of whom would seek to maximize his or her profit from any transaction involving the property. See Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The value of property as of a particular date is a question of fact. E.g., Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Messing v. Commissioner, 48 T.C. 502, 512 (1967). A sound valuation

is based upon all relevant facts.  Sec. 20.2031-1(b),
Estate Tax Regs.

In determining the value of an asset, we are not
bound by the formulae and opinions proffered by an expert,
especially when they are contrary to our judgment.  Chiu
v. Commissioner, 84 T.C. 722, 734 (1985).  Instead, we may
reach a decision as to the value of the property based on
our own analysis of all the evidence in the record,
Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir.
1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner,
supra at 941, using all of one party's expert opinion,
Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74
T.C. 441, 452 (1980), or selectively employing any portion
of such an opinion, see Parker v. Commissioner, 86 T.C.
547, 562 (1986).

With the above principles in mind, we have reviewed
the arguments of the parties, together with the testimonial
and documentary evidence presented.  Based upon all of the
facts and circumstances of this case, we believe that the
decedent's land was worth $600,000 on the date of the
decedent's death, September 7, 1990.  We set forth below
several comments about the arguments of the parties and the
facts of this case.

## BAAS Appraisal

The BAAS appraisal valued the decedent's 56.5 acre parcel of land using the comparable sales method. According to the appraisal, the following land sales were comparable to the decedent's 56.5 acre parcel:

| Sale | Date of Sale | Comparable Sale Price | Acres | Price/Acre | Environmentally Protected |
|------|--------------|----------------------|-------|-----------|---------------------------|
| 1 | Aug. 1989[1] | $1,446,783 | 101.137 | $14,325 | 40% |
|   | arguably | -- | 120.379[2] | 12,056 | -- |
| 2 | Jan. 1989[3] | 826,700 | 61.400 | 13,464 | 35 |
|   |  | 909,300 | 61.400 | 14,809 | 35 |
| 3 | Aug. 1988 | 8,300,000 | 577.800 | 14,365 | 30 |
| 4 | May 1988 | 11,146,000 | 648.820 | 17,179 | 35 |
| 5 | Jan. 1988[1] | 2,975,000 | 162.700 | 18,285 | 25 |
| 6 | Dec. 1986 | 1,300,000 | 89.500 | 14,525 | 06 |
| A | Dec. 1989[4] | 240,000 | 5.500 | -- | -- |
|   |  | 240,000 | 1.010 | -- | -- |

[1]This transaction was included as a comparable sale in both the BAAS appraisal and the Fishback appraisal, discussed below.

[2]This parcel of property contained approximately 120.379 acres of which approximately 20 acres was reserved for a school and park. The appraisal calculated the price per acre based upon the gross acreage, 120.379 acres, and the price per acre based upon the net acreage, 101.137 acres.

[3]The first purchaser of this property in January 1989 exercised an option to purchase it for $826,700 before reselling the property for $909,300.

[4]This transaction involved a land swap between the developers of the Citrus Park Mall and the Tampa Electric Co.

The BAAS appraisal concludes that as of June 18, 1990, the value of the decedent's property was $14,000 per acre or $791,000 (56.5 acres times $14,000) In arriving at that

conclusion, the BAAS appraisal relied principally on

comparable #1, the August 1989 sale of between 101.137 and

120.379 acres to Hillsborough County for $1,446,783.  The

operative passage of the BAAS appraisal states as follows:

> The sale by [sic] Hillsborough County [comparable
> #1] is of great significance, due to the date the
> sale took place, the similarity of the size, and
> the parcel's proximate location.
>
> The Hillsborough County purchase of a parcel to
> buffer its sewer plant reflects a price of
> between $12,056 and $14,325 per acre.  Centex,
> the seller, obviously placed a value on the land
> based on its residential potential.  The county
> typically pays somewhat of a premium, like most
> governmental and quasi governmental agencies.
> This occurs due to disadvantages in negotiations
> and a desire to avoid confrontation or legal
> action.  Consequently, we have adjusted the sale
> price that we split between the $14,325 high and
> $12,056 low indicator.  We also adjusted this
> comparable up for its inferior location.  We have
> concluded a value indicator of $14,000/AC from
> this sale.
>
> The other comparables are at least 18 months old.
> The unadjusted sale price, on a per acre basis,
> varies from $13,464 [comparable #2] to $18,285
> [comparable #5].  Interestingly, the oldest
> comparable [comparable #6] is for a 90 AC
> defunct orange grove which sold in December,
> 1986 for an unadjusted price of $14,525/AC.
> This parcel encompasses a 5 AC lake and has
> no environmentally sensitive land.  Hence, our
> sales do not indicate an upward trend in value.
> We believe that the major fall in construction
> activity in Hillsborough County accounts for
> the stable prices of large, raw acreage tracts.
> Few developers can afford to tie up major funds
> in warehousing future development sites.

On the whole, the comparable sites offer similar opportunities to a developer of a large acreage subdivision. We believe that what the subject lacks in percentage of buildable land compared to other sites, it makes up in its development potential that allows a much higher density. Except for the Cathryn Sheldon site [comparable #2], the approved density at the comparables under zoning or present land use designation is much lower. In light of the value indicators derived from an analysis of the comparable sales, we conclude a total market value of $791,000.

The BAAS appraisal notes that "Approximately 40% of the total site [comparable #1] is environmentally sensitive." The appraisal also notes that approximately 20 acres of the usable land was reserved for a school and park.

Petitioner complains that the BAAS appraisal does not set forth the purchase price for each comparable on a "per usable acre" basis. According to petitioner, when the comparable sales used in the BAAS appraisal are analyzed on a price per usable acre basis, it shows that the comparables were sold for approximately $20,000 per usable acre. Petitioner's analysis is as follows:

| Comparable | Purchase Price | Acres | Percent Wet | Price Per Usable Acre |
|---|---|---|---|---|
| 1 | $1,446,783 | 101.137 | 40 | $23,842 |
|  | 1,446,783 | 120.379 | 40 | 20,031 |
| 2 | 826,700 | 61.400 | 35 | 20,714 |
|  | 909,300 | 61.400 | 35 | 22,784 |
| 3 | 8,300,000 | 577.800 | 30 | 20,521 |
| 4 | 11,146,000 | 648.820 | 35 | 26,429 |
| 5 | 2,975,000 | 162.700 | 25 | 24,380 |

| 6 | 1,300,000 | 89.500 | -- | 14,525 |

Thus, according to petitioner, the BAAS appraisal supports the value reported on the decedent's estate tax return.

Petitioner also notes that the subject property had been informally shown to buyers by various brokers over the course of approximately 1-1/2 years with an asking price of $25,000 per usable acre. The property was then formally listed with Wegman Realty, and that firm showed the property to approximately 200 persons over the course of another 1-1/2 years in an attempt to sell the property for the same price. Despite those efforts, no offer to purchase the property was received. Petitioner notes that respondent's value of $791,000 is $33,659 on a per-usable-acre basis (23.5 usable acres). If the decedent's property was truly worth over $33,000 per usable acre, petitioner asks why no one offered to purchase the property at the listed price of $25,000 per usable acre.

We note that, on the date of death, September 7, 1990, it was generally known that Hillsborough County planned to acquire a part of the decedent's property in connection with its plan to widen and realign Paglen Road. However, at that time, the precise configuration of the road project was not known. It stands to reason, as both Mr. Sirmans

and Mr. Wegman testified, that the uncertainty of the road project at that time made it difficult to sell the property and temporarily decreased the property's value.  This is confirmed by that fact that Mr. Sirmans received no offer to purchase the property as a result of the marketing efforts of Wegman Realty from late 1989 through the date of death.

The BAAS appraisal purports to value the property as of June 18, 1990.  However, the appraisal makes clear that BAAS did not take into account the road project.  Assumption No. 5 of the appraisal states as follows:

> We have valued the subject in its current con-
> dition, prior to an announced taking of right-
> of-way for a 122' wide strip connecting Gunn
> Highway and Sheldon Road that will transverse
> the subject.

It is evident, therefore, that the BAAS appraisal fails to take into consideration a significant factor that bears on the value of the decedent's property as of the date of death.

Fishback Appraisal

The Fishback appraisal utilized a three-step process in arriving at the market value of the 4.83 acres to be acquired for the proposed right-of-way, including damages

to the remaining property.  First, the appraisal valued the parent tract, the parcel designated folio 3143, before the "taking".  Second, the appraisal valued the 4.83 acres of folio 3143 and a barbed wire fence which were taken.  Finally, the appraisal valued the remainder of folio 3143 after the taking.

According to the Fishback appraisal, the following land sales were comparable to the parcel designated folio 3143:

| Comparable | Date of Sale | Price | Size/ Acres | Dry | Wet | Price Per Gross Acre | Price Per Dry Acre |
|---|---|---|---|---|---|---|---|
| 1 | 7/30/90 | $360,000 | 9.340 | 9.34 | -- | $38,544 | $38,544 |
| 2 | 6/26/90 | 285,000 | 9.810 | 9.81 | -- | 29,052 | 29,052 |
| 3 | 3/13/90 | 705,000 | 50.000 | 50.00 | -- | 14,100 | 14,100 |
| 4[1] | 7/31/89 | 1,446,783 | 101.137 | 50.50 | 50.5 | 14,305 | 28,649 |
| 5 | 12/22/88 | 1,650,000 | 54.474 | 53.00 | 1.474 | 30,290 | 31,132 |
| 6[2] | 1/01/88 | 2,873,500 | 162.700 | 122.00 | 40.7 | 17,661 | 23,553 |
| Listing 1 | | 900,000 | 67.062 | 45.702 | 21.36 | 13,420 | 19,693 |

[1]Same as comparable #1 of the BAAS appraisal.

[2]Same as comparable #5 of the BAAS appraisal.

Based upon the above comparables, the appraisal concludes that the value of the parcel designated folio 3143 was $13,000 per acre or $390,390 (30.03 acres x $13,000).  The operative passage of the Fishback appraisal is as follows:

> The subject has been listed on the open market
> at $25,000 per gross acre for approximately a
> two year period.  The sale price was based on a
> 25 acre size and about 10 acres was estimated by
> the appraisers as environmentally sensitive land.
> Because of the possible environmental constraints
> for the unusable areas relative to future

development, it is our opinion that a prudent purchaser would pay substantially less in today's market.

Sale Nos. 1, 2, 4, 5, and 6 were considered superior to the subject for reasons previously mentioned (zoning and/or location). Sale No. 3 is located in close proximity to the subject and is considered a more reliable indicator of value. Listing 1 is a property listing which would indicate the upper value limit for the subject.

Based on the preceding, it is our opinion that the estimated market value of the property would be $13,000 per acre based on the gross acreage. The [sic] equates to $19,520/acre for the usable 20 acre size. Therefore:

$13,000/acre X 30.03 acres = $390,390

ROUNDED TO = $390,500

The second step in the appraisal was to value the part of the property taken by the County, consisting of a 4.83-acre strip which the Fishback appraisal described "as part of the upland area of the parent tract". The Fishback appraisal describes the value of the part of the property taken as follows:

The value of the upland area of the parent tract [i.e., usable land] was estimated at $19,500 per acre (rounded). The same sales that were used in valuing the entire parcel in the before situation have been utilized in valuing the subject taking. Sales of lands similar to the strip taking [sic] are scarce in the market place. Therefore, we have relied on the documented sales which were used to provide an indication of value for the parent tract. It is our opinion that the exist-

ing barb wire fence line makes some contribution to value.  The cost to replace the barb wire fencing along the north boundary was estimated by the appraisers based on estimates obtained from fencing contractors throughout Hillsborough County.  The fence appears to be about five years old based on the observed condition.  We have estimated the depreciation at 50%.  Therefore, the value of the part taken is summarized as follows:

LAND AREA

4.83 acres X $19,500/acre        =  $94,185

IMPROVEMENTS

Barb wire
  fence:  135 LF X $2/LF X 50%   =  $   135

TOTAL VALUE OF THE PART TAKEN  =  $94,320

The final step in the appraisal is to value the property remaining "after the taking" to determine whether the value of that property would be diminished as a result of the taking.  According to the Fishback appraisal, the completion of the road project would actually enhance the value of the remaining property.  The appraisal states as follows:

After the taking, the "L" shaped parent tract will be separated into three separate parcels with increased road frontage and exposure from the proposed Paglen Road.  *  *  *

*   *   *   *   *   *   *

The subject property is located on a two lane local arterial. After the taking, the three remainder tracts will be located on a heavily travelled two lane thoroughfare which will ultimately be expanded to six lanes. This will greatly improve access and exposure to the sites. In our opinion, the change will act to enhance the value of the subject properties. Various conversations with the Hillsborough County Planning Commission, Department of Development and Review and Zoning Departments indicate that higher intensive uses are probable, subject to rezoning and site plan review. The highest and best use before the taking, was considered to be an agricultural use until the demand ripens for additional residential uses in the area. The highest and best use of the subject parcels after the taking was considered to be a transitional agricultural use to future residential and office usage. Support for the value enhancement will be measured in the following "Land Valuation-After" section. Before the taking, the subject property had an estimated market value of $13,000 per gross acre. After the taking, the remainder parcels have an overall estimated market value of $36,111 per gross acre. This represents about a $23,000 per gross acre value enhancement.

In our opinion, the proposed road project would favorably impact a number of properties in the immediate vicinity of the subject. For this reason, these benefits have been classified as general, which do not offset damages, if any.

## Property Tax Value

Petitioner asserts that the assessed value of the decedent's land for property tax purposes was $472,640 for tax years 1988, 1989, and 1990. Petitioner argues that this assessed value for property tax purposes is probative of the value of the decedent's property in view of the fact

that in Florida property tax values must be based upon a "just valuation" of the subject property.  See <u>McArthur Jersey Farm Dairy, Inc. v. Dade County</u>, 240 So. 2d 844 (Fla. Dist. Ct. 1970)(citing (<u>Walter v. Schuler</u>, 176 So. 2d 81, 85-86 (Fla. 1965)).

In this case, the parties have stipulated that the assessed value of the subject property "as of 1988" was $472,640.  However, the record does not support petitioner's assertion that the subject property was assessed at the same amount "in years 1988, 1989 and 1990". In fact, the BAAS appraisal states that the assessed value of the subject property was as follows:

| Year | Property Tax Value | Per Acre Gross 56.5 | Per Acre Dry 23.47 | Percent Change |
|------|------|------|------|------|
| 1986 | $267,560 | $4,735.58 | $11,400.09 | |
| 1987 | 314,250 | 5,561.95 | 13,389.43 | 17 |
| 1988 | 833,000 | 14,743.36 | 35,492.12 | 165 |
| 1989 | 472,640 | 8,365.31 | 20,138.05 | -43 |

<u>Sale to the County</u>

Petitioner argues that the sale of 4.83 acres of land to Hillsborough County for approximately $20,000 per acre is the "best evidence of fair market value" of the decedent's property.  According to petitioner, this sale "was a negotiated sale between arm's length parties", not a forced sale; it was made reasonably close to the valuation

date; and there is no evidence that the conditions of the property changed in any material way between the date of death and the date of the sale.

Even if we accept petitioner's contention that the sale of 4.83 acres of the decedent's land to Hillsborough County was an arm's-length sale by a willing buyer to a willing seller, we are not certain that it is the best evidence of the fair market value of the decedent's land. We infer that petitioner may have had an incentive to reach a speedy agreement for sale of the 4.83 acres with Hillsborough County and may have been willing to sell the property for less than its fair market value. We base that inference on three factors: (1) It was difficult to sell the decedent's property until Hillsborough County's plans for the road project became more definite and known; (2) the construction of the road project was anticipated to increase the value of the surrounding areas, including decedent's land; and (3) the County had the power to condemn the property.

To reflect the foregoing and concessions,

Decision will be entered
under Rule 155.